# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 9, 2014 Session

## STATE OF TENNESSEE v. BILLY JASON HANCOCK

**Appeal from the Criminal Court for Putnam County**
**No. 11-0125     David Patterson, Judge**

_____

**No. M2012-02307-CCA-R3-CD - Filed December 12, 2014**

_____

The defendant, Billy Jason Hancock, appeals his Putnam County Criminal Court jury convictions of first degree murder, especially aggravated kidnapping, and abuse of a corpse, claiming that the trial court erred by concluding that certain communications with his wife and his pastor were not protected by any evidentiary privilege and that the trial court's instruction regarding jury unanimity during the penalty phase was incorrect. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Robert T. Marlow, Shelbyville, Tennessee (on appeal and at trial), and James A. Simmons, Henderson, Tennessee (on appeal), for the appellant, Billy Jason Hancock.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Randall York, District Attorney General; and Mark Gore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Putnam County Criminal Court jury convicted the defendant of one count of premeditated murder, one count of felony murder, one count of especially aggravated kidnapping, and one count of abuse of a corpse for his brutal attack on the victim, Jennifer Cornell. The trial court merged the jury verdicts of premeditated murder and felony murder into a single first degree murder conviction, and the jury imposed a sentence of life imprisonment without the possibility of parole. The trial court imposed a sentence of 20

years' incarceration for the conviction of especially aggravated kidnapping and ordered that it be served consecutively to the sentence of life without the possibility of parole. The court imposed a sentence of two years' incarceration for the conviction of abuse of a corpse, to be served consecutively to the sentence of life without the possibility of parole but concurrently with the 20-year kidnapping sentence.

The evidence adduced at trial established that in August 2008, the victim informed the defendant and his wife, Emily Hancock, that the defendant was the father of her 16-year-old daughter. After he initially expressed a desire to establish a relationship with the child, the defendant denied that he was the child's father. Shortly thereafter, the victim went to the district attorney's office seeking a child support order. Deoxyribonucleic acid ("DNA") testing performed in conjunction with that action established that the defendant was the child's father. The revelation about the child's parentage as well as the potential of a money judgment for child support prompted Ms. Hancock to file for divorce. Ms. Hancock testified that she and the defendant were experiencing financial difficulties at that time and that she did not want any part of the defendant's income to go toward the support of the daughter he shared with the victim. The defendant's pastor testified that the defendant and his wife had been experiencing marital difficulties for sometime and that the child support action added to that stress.

The victim went missing on the morning of October 30, 2008. After learning that the victim had failed to arrive at work as scheduled and after he was unable to contact the victim, the victim's husband asked her employer to go to their home and check on her because it was extremely out of character for her to be late for work or not answer her telephone. Her employer found the victim's car sitting near the stop sign at the end of Vaughn Lane, approximately 150 feet from her driveway. The car's engine was running, the driver's side door was open, and the victim's purse was in the passenger's seat.

The defendant's cousin, Wayne Hancock, testified that the defendant borrowed his 1990 Dodge pickup truck on the morning of October 30, 2008, and that the truck was outfitted at that time with wooden stock racks. Witnesses reported having seen a truck matching that description on Vaughn Lane near the time of the victim's disappearance. Another witness saw the same truck drive down Colson Lane toward the sinkhole where the victim's body was later discovered. A coworker of the defendant's testified that the defendant once said, "[W]ell if I was going to kill somebody, I know a place I'd put them and nobody would ever find them. I said that hole over there and he said yeah and just laughed it off, you know." That same coworker was among the search party that discovered the victim's body in the sinkhole, which was located approximately 1,800 feet from the defendant's residence.

The defendant admitted to both his pastor and his wife that he had seen the victim on the morning she disappeared. He told his pastor that he had picked the victim up so that the two could discuss the child support action and that he had left her, alive, near the Standing Stone bridge.

The victim's body was discovered nude from the waist down with sticks protruding from her vagina and rectum. She had been brutally beaten with what appeared to be "a large wooden dowel rod or like a handle that you would use in a shovel." Splinters from the dowel rod were recovered from the scene and reconstructed by the Tennessee Bureau of Investigation ("TBI"). Wayne Hancock testified that a dowel rod consistent in appearance to the one reconstructed by the TBI had been in the bed of the pickup truck he loaned to the defendant. He was unable to locate the rod after the defendant returned the truck. Forensic testing revealed the presence of the defendant's DNA on the dowel rod reconstructed by the TBI.

The medical examiner testified that the victim died from "blunt force injuries to the head." The victim suffered a number of significant blunt force injuries to her head, including some that were "consistent with" the victim's having been struck with a rod similar to that reconstructed by the TBI. One blow above the victim's eye was significant enough to break her skull, causing the "skull bone" to protrude "through the skin tear." An "[o]pen complex skull fracture" to the back of the victim's head penetrated "all the way through to the brain." In fact, her skull was fractured in "multiple places, both in the front and in the back," significantly enough to make her brain visible. Due to the trauma of some of the blows, "a portion of the brain tore off and actually came out one of these open fractures and lacerations." Pieces of the victim's brain were recovered from the crime scene. The medical examiner noted that the victim's face had "the appearance of a deflated basketball. And the reason that's so is because the facial bones are fractured, her nose, the bone supporting her eyes, her forehead, the center of her lower jaw bone. . . . [H]er facial bones have been crushed." Several of her teeth had been knocked out, and she had bitten nearly all the way through her tongue. The medical examiner stated that, "to a reasonable degree of medical certainty . . . all these blows to the head [occurred] when she's living."

The medical examiner also noted a secondary diagnosis of "blunt trauma injuries to the torso" because the blows to the victim's anterior abdomen and the back were also lethal. He observed that the parallel-line pattern of the bruises on the victim's back and abdomen indicated that they were caused by blows from "a long hard object, a baseball bat, a table leg, a branch of a tree, you know, a stick, a pole." He opined that the blows were consistent with having been caused by the wooden rod reconstructed by the TBI. The victim suffered multiple rib fractures, multiple vertebral fractures, and "[m]ultiple small lacerations of the lower lobe of the right lung." One vertebra "fractured so significantly" that "it actually

tore into the space next to it and several of the ribs in that area that attach that area were also broken. And when the ribs broke, the pieces went forward and they punctured the bottom of the right lung." That single blow was so significant, in fact, that it "stretched the adjacent aorta and there are little lacerations, there were tears that you can see on the inside of the aorta. We typically see those in car crashes where there's rapid decelerations." He indicated that the most significant fracture "occurred after death," as indicated by the fact that the wound produced very little bleeding.

The victim also suffered "[s]mall abrasions in the vaginal mucosa" that were "related to" the "foreign bodies protruding, there were dried vine branches that were in the rectum and that were in the vagina." The medical examiner retrieved two sticks from the victim's vagina and one from her rectum, which stick was placed in her rectum with such force that it "went through the rectal mucosa" into the victim's abdomen. He testified that the insertion of the sticks occurred "peri-mortem or possibly even post-mortem."

The medical examiner opined that all of the blows to the victim's body could have been administered in as little as five minutes.

Based upon this evidence, the jury convicted the defendant as charged of premeditated murder, felony murder, especially aggravated kidnapping, and abuse of a corpse. Following a sentencing hearing, the jury concluded that the State had proven beyond a reasonable doubt that the "murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death" and that the "murder was knowingly committed, solicited, directed or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit or was fleeing after having a substantial role in the committing or attempting to commit kidnapping." The jury imposed a sentence of life without the possibility of parole.

In this timely appeal, the defendant challenges the trial court's ruling with respect to his assertion of the marital communications privilege to exclude certain testimony from his ex-wife, the trial court's ruling with respect to his assertion of the clergy-penitent communications privilege to exclude certain testimony from his pastor, and the penalty-phase jury instruction regarding unanimity as to sentence.

*I. Marital Communications Privilege*

The defendant first asserts that the trial court erred by concluding that the marital communications privilege did not apply to statements made by the defendant to his wife concerning the victim both before and after the victim's disappearance. The State contends that the trial court's ruling was correct.

-4-

Tennessee Code Annotated section 24-1-201 governs the application of the marital communications privilege:

>(a) In either a civil or criminal proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party to the proceeding.

>. . . .

>(c) (1) In a criminal proceeding a marital confidential communication shall be privileged if:

>(A) The communications originated in a confidence that they will not be disclosed;

>(B) The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;

>(C) The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and

>(D) The injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation.

T.C.A. § 24-1-201(a), (c).

At the hearing on the defendant's pretrial motion to exclude Ms. Hancock's testimony, Ms. Hancock testified that at the time of the victim's murder, she had obtained divorce papers but "hadn't signed them." She said that when the victim revealed in August 2008 that the defendant was the father of her daughter, the defendant and Ms. Hancock were experiencing financial difficulties that would have been exacerbated by a child support payment. On October 30, after the victim was reported missing and after the defendant had been questioned and released by the police, Ms. Hancock implored the defendant to tell her anything he knew about the victim's disappearance "and he said that he hadn't seen her, that he hadn't been with her." On the following morning, the defendant told Ms. Hancock that "he didn't want to talk about it, he'd done answered my question, to leave it." After his arrest, the defendant told her over the telephone that "he didn't know where she was at, . . . that he didn't see her, that he didn't know."

Ms. Hancock acknowledged that she had an affair in 2007, and the defendant found out about the relationship in May 2008. As a result, she and the defendant were no longer intimate. Regarding the state of her marriage at the time of the victim's disappearance, she said, "My marriage was over, but I was trying to save it for my children." Ms. Hancock filed for divorce on January 11, 2011, and the divorce was granted on May 16, 2011. Ms. Hancock testified that she did not file for divorce sooner because she did not have the money to do so.

Amy Leigh Sells testified that she and the defendant commenced a romantic relationship while they were both incarcerated in the Overton County Jail. The two wrote letters to one another and communicated via "the minimum [security] yard, which the windows would face into the cell where" the defendant was housed. The defendant wrote 50 to 75 letters to Ms. Sells during her 14-month confinement, espousing his love for her and making a number of sexual references. Ms. Sells said that at the time she believed they would have a relationship, explaining,

> [I]t's hard to explain to people that's never been in jail. It's a totally different world in there. And like I said, I've known him for a long time and I really didn't want to believe that he could do something like that. So you know, forgive my foolish female heart is all I can say.

The trial court concluded that the marital communications privilege did not apply to the defendant's communications with his wife regarding the victim. The court noted that "[a]t the time of the murder, the marriage to Emily Hancock was at best unstable" and found "that the [d]efendant had been given divorce papers by his wife shortly before the murder; that the parties are now divorced; that this is not a relationship that needs to be sed[ul]ously fostered; and none of the conversations were given in a confidential relationship."

By the time of the victim's disappearance, Ms. Hancock had already had divorce papers prepared. She testified that the marriage "was over" at that time, having collapsed under the weight of financial difficulty, infidelity, and the victim's pursuit of child support. By the time of the trial, the couple was divorced. Under these circumstances, the record establishes that the element of confidentiality was not "essential to the full and satisfactory maintenance of the relation between the parties" and that the relationship was not one that "ought to be sedulously fostered." *See* T.C.A. § 24-1-201(c)(B)-(C); *see also State v. Mitchell*, 137 S.W.3d 630, 639 (Tenn. Crim. App. 2003) (holding that "the trial court must conduct its inquiry relative to factors (B), (C), and (D) [of Code section 24-1-201(c)] by assessing the present status of the marital relationship at the time it is called upon to do so,

rather than at the time of the communication in question"). Consequently, the trial court did not err by concluding that the marital communications privilege did not apply to the challenged statements.

## II. Clergy-Penitent Privilege

The defendant next contends that the trial court erred by concluding that the clergy-penitent communications privilege did not apply to statements made by the defendant to his pastor concerning the victim after the victim's disappearance. The State contends that the trial court's ruling was correct.

Code section 24-1-206 provides, in pertinent part, as follows:

> No minister of the gospel, priest of the Catholic Church, rector of the Episcopal Church, ordained rabbi, or regular minister of religion of any religious organization or denomination usually referred to as a church, over eighteen (18) years of age, shall be allowed or required in giving testimony as a witness in any litigation, to disclose any information communicated to that person in a confidential manner, properly entrusted to that person in that person's professional capacity, and necessary to enable that person to discharge the functions of such office according to the usual course of that person's practice or discipline, wherein such person so communicating such information about such person or another is seeking spiritual counsel and advice relative to and growing out of the information so imparted.

T.C.A. § 24-1-206(a)(1).

At the hearing on the defendant's motion, George Turke, pastor of Cornersville United Methodist Church and Lewisburg Chapel United Methodist Church, testified that prior to the victim's disappearance, he had counseled the defendant for four to six months on his relationships "[w]ith the Lord and with his wife." The defendant relayed to the pastor the difficulties in his marriage, particularly those arising from the victim's revelation that the defendant was the father of her daughter and the pending child support action. Following the victim's disappearance, Mr. Turke met with the defendant in the parking lot of Martin's Chapel in Allons to discuss the victim's disappearance. At that point, Mr. Turke asked the defendant if he knew where the victim was, and the defendant "got agitated" and said, "I'm getting sick and tired of her messing up my life and trying to mess my marriage up." Mr.

Turke told the defendant that he had informed the police about their location and that law enforcement officers were on their way to the church to talk to him. Mr. Turke said that no spiritual counseling took place during that conversation, explaining, "I felt that was my paramount duty, not just as a citizen, but even as a pastor was to find the location [of the victim]."

The defendant was taken to the Overton County Justice Center, and Mr. Turke followed. While at the justice center, the two had a private conversation during which the defendant admitted "that, yes, he did talk with [the victim] that morning, she was with him, they went to the park and . . . she wanted to get out." The defendant told Mr. Turke that "they had gotten in an argument, and he left her off at a bridge, turned around and came back and he looked in his rear view mirror and she was walking back towards town, I guess." Mr. Turke acknowledged that during that conversation, he did encourage the defendant to open up so that he could ask for forgiveness, but he stated that the primary purpose of that conversation was to locate the victim. Mr. Turke said that he told the defendant that he would share any relevant information with the police, explaining,"I let him know that if he gave me any information pertaining to the whereabouts of [the victim], I was going to inform them and let them know."

Mr. Turke said that he had another conversation with the defendant on the following morning and that he asked the defendant to be specific about where he had left the victim. At that point, the defendant provided Mr. Turke with more detail. Mr. Turke said that he made it clear at that time that his primary concern remained locating the victim.

A fourth conversation took place after the defendant had been arrested and included the defendant's wife and children. Mr. Turke described that conversation as "more Christian counseling than anything." During that conversation, Ms. Hancock asked the defendant if he was with the victim on the morning of her disappearance, and the defendant said that he was.

The trial court concluded that Mr. Turke possessed the qualifications necessary for the application of the privilege but that the conversations he had with the defendant following the victim's disappearance were not confidential communications. The court observed that Mr. Turke made it clear to the defendant during these conversations that his paramount concern was locating the victim and that he intended to share with the police anything the defendant revealed regarding the victim's disappearance. With regard to the fourth conversation, the court observed that the defendant's wife and children were present and that the challenged statement was made by the defendant to his wife and not to Mr. Turke.

In our view, the record supports the findings of the trial court. The plain language of the statute protects only those communications made when the penitent was "seeking spiritual counsel or advice" related to the information communicated. That was clearly not the case here. Mr. Turke made it clear during each of the first three challenged conversations that his paramount concern was finding the victim. No spiritual counseling took place. Although the stated purpose of the fourth conversation was spiritual counseling, that conversation took place in the presence of the defendant's wife and children, and the challenged statement was actually made to the defendant's wife. Under these circumstances, the trial court did not err by refusing to apply the clergy-penitent privilege.

### III.  Jury Instruction

Finally, the defendant avers that the trial court's penalty-phase instruction on unanimity was incorrect because it did not communicate the requirement that the jury must unanimously agree that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. He also complains that the instruction "did not make it clear that jurors' decisions on mitigation evidence need not be unanimous." The State asserts that the instruction adequately conveyed the requirements of the statute.

An accused's constitutional right to trial by jury, *see* U.S. Const. amend VI; Tenn. Const. art. 1, § 6, encompasses a right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see Teel*, 793 S.W.2d at 249; *see also* Tenn. R. Crim. P. 30.

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

The trial court instructed the jury as follows:

> If you unanimously determine that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, you shall, in your considered discretion, sentence the defendant either to imprisonment for life without the possibility of parole or to imprisonment for life.

The court also instructed the jury that, in making its determination, it could "weigh and

consider any of the statutory aggravating circumstances proved beyond a reasonable doubt and any mitigating circumstances which may have been raised by the evidence throughout the entire course of this trial, including the guilt finding phase or sentence phase or both." Additionally, the court instructed the jury that "in arriving at the punishment the jury shall consider, as previously indicated, any mitigating circumstance raised by the evidence." Most importantly, the trial court stated that "[t]he defendant does not have the burden of proving a mitigating circumstance" and that "[t]here is no requirement of jury unanimity as to any particular mitigating circumstance or that you agree on the same mitigating circumstance."

In our view, the trial court's instructions provided a correct statement of the law. The trial court clearly and repeatedly instructed the jury that it could consider any mitigating circumstance "raised by the evidence" but only those aggravating circumstances proven beyond a reasonable doubt. Additionally, the court made it clear that jury unanimity was not required with regard to the mitigating circumstances. Finally, the defendant is incorrect in his assertion that the aggravating circumstances must outweigh the mitigating circumstances before the jury can impose a sentence of life without the possibility of parole. Code section 39-13-204(f)(2) provides that the jury may impose a sentence of life without the possibility of parole if it "unanimously determines that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt." T.C.A. § 39-13-204(f)(2) ("If the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, but that such circumstance or circumstances have not been proven by the state to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or to imprisonment for life."). Only for a sentence of death does the Code require that the jury find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. *Id.* § 39-13-204(g)(1)(B).

*Conclusion*

Because the trial court did not err by refusing to apply either the marital communications privilege or the clergy-penitent privilege and because the penalty-phase instructions provided by the trial court were correct, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE