# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 29, 2014 Session

## STATE OF TENNESSEE v. JEFFREY SCOTT TUCKER

**Appeal from the Criminal Court for Putnam County**
**No. 13-0049     Leon C. Burns, Jr., Judge**

---

**No. M2014-00861-CCA-R3-CD – Filed February 26, 2015**

---

The defendant, Jeffrey Scott Tucker, was convicted after a jury trial of assault, a Class A misdemeanor; assault of a law enforcement officer, a Class A misdemeanor; domestic assault, a Class A misdemeanor; and resisting arrest, a Class B misdemeanor.  The defendant challenges the sufficiency of the evidence for the domestic assault conviction, contending that the testimony did not establish that the victim was in fear.  The simple assault conviction, which the parties agreed would merge with the domestic assault conviction, was dismissed by the trial court after the jury returned a verdict.  The defendant asserts that allowing the jury to consider the simple assault charge was error that affected his other convictions.  We conclude that the evidence is sufficient to sustain the verdicts. We further conclude that the jury properly considered the simple assault charge. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROGER A. PAGE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Samuel J. Harris (at trial) and Seth B. Pinson (at motion for a new trial and on appeal), Cookeville, Tennessee, for the appellant, Jeffrey Scott Tucker.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Stephanie Johnson and Beth Willis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The events giving rise to the defendant's convictions occurred when the defendant began acting irrationally after ingesting alcohol and cocaine. After the defendant assaulted his girlfriend, sought admittance to a neighbor's house uninvited, and curled up in the fetal position in a wooded area while screaming incessantly, law enforcement attempted to apprehend the defendant. Despite the use of a taser and K-9 police dog, law enforcement had difficulty restraining the defendant, and one officer sustained a blow to the face. The defense proceeded on the theory that the defendant did not have the requisite mens rea because he was hallucinating during the alleged assault on his girlfriend and because he was only attempting to avoid the dog in the woods. The defendant was charged in a six-count indictment with the aggravated assault of his girlfriend by strangulation; the assault of a law enforcement officer; domestic assault by causing the victim to reasonably fear imminent bodily injury; simple possession of cocaine; possession of cocaine with the intent to deliver; and resisting arrest. The defendant entered a guilty plea to the simple possession charge prior to trial, and the State dismissed the charge of possession with intent to deliver.

The victim of the domestic assault reluctantly testified for the prosecution. At one point, the victim stated, "I'll shoot myself in the foot before I call the cops again." The victim stated that the defendant was currently her boyfriend and that the two had been staying with a friend of hers on June 27, 2012. The air conditioning had gone out, and the repairman, who arrived around 6:00 p.m., was the victim's ex-boyfriend. The defendant had been drinking since the morning, and he began accusing her of infidelity. The victim said that the defendant suddenly "just flipped out" and that he was angry. He followed her to the bathroom, where she was doing laundry, and he began to pull at her belt, yelling about her supposed infidelity. He followed her to the kitchen, continuing to argue and yell. The defendant went to his truck and was "even more irate with [the victim]" when he returned. At that point, the defendant grabbed her from behind, in what the victim described as a wrestling move. The victim testified that the defendant appeared to be hallucinating and was fighting an imaginary opponent while holding on to her. She testified that she was never in a choke hold and that the defendant never strangled her. She acknowledged that the defendant unintentionally kicked her once on the calf and unintentionally hit her once on the head. The defendant was ordering someone to "[g]et back" at times and speaking unintelligibly at other times. The defendant returned to his truck, and the victim locked him out "[b]ecause he was acting crazy." The defendant kicked down the deadbolt to reenter, still yelling at the victim. When he went to the bedroom, the victim ran outside behind the house and called 911, and the defendant ran into the woods across the street.

When asked if the defendant's actions frightened her, the victim testified, "I think that would frighten anybody." The victim, however, stated numerous times that the defendant was not violent towards her that night but simply acted "crazy." The prosecution pressed, "But you were scared enough that you locked the door when he went out of your house; is that right?" The victim responded, "Yeah. Just, I thought maybe he'd just get in his truck and go." The victim also repeated several times that she was not frightened for her life and that if the defendant had wanted to hurt her, he could have. She testified that she called the police because "I felt I needed help to do something with him. Not that I was scared of him." She acknowledged that she ran away from him and left him in the house but explained that she was seeking someone to help him.

The victim saw police arrive and told them the defendant's name. She heard the police call for him to come out of the woods and testified that she saw them simultaneously release the dog from the leash. She stated that she told police that she was kicked and hit unintentionally and that the police report stating the defendant struck her on the head was incorrect. She testified that the defendant was not violent and that, while she had a bruise on her arm, it was sustained during the defendant's battle with an imaginary foe. According to the victim, the defendant was not in his right mind and did not direct any violence toward her.

The defendant proceeded to the house of a neighbor with whom he was unacquainted. Mary Cottrell testified that around 10:30 p.m. on June 27, 2012, somebody began to rattle her storm door. She opened the front door but kept the storm door locked. The defendant was standing there "kind of out of it," shaking the door and screaming that "they were after him, they were going to kill him, and he wanted to come in." Ms. Cottrell told the defendant that she was going to call the police, and he left. She saw him later being brought out of the woods in handcuffs. She testified, "He was trying to fight them, like he didn't want to go with them, or he didn't know who they were, or something."

Sergeant Terry Woodcock, Officer Chris Melton, and Officer Josh Ward testified regarding the apprehension of the defendant. The three officers, along with Sergeant Jeff Johnson, responded originally to the call placed by Ms. Cottrell regarding a possible burglary. As Sergeant Woodcock approached Ms. Cottrell's residence, he saw the victim waving him down. The victim was "frantic," and as a result of their conversation, Sergeant Woodcock began to search for the defendant. All three officers testified that they heard an inarticulate screaming and yelling coming from the woods. Sergeant Woodcock called out, identifying the officers as police, commanding the defendant to come out, and threatening to release the dog. Although Sergeant Woodcock repeated this command numerous times,

the only response was continued screaming. The police entered the wooded area with the light of their flashlights. All three testified that the dog remained on his leash the entire time. Officer Melton, who was the handler of the dog, testified that the leash was fifteen feet long and that the dog was on the leash even when he was attacking the defendant.

All three testified that the defendant was lying in a clearing in a fetal position, screaming. Sergeant Woodcock described him as "out of his mind." Officer Melton identified himself as a police officer and commanded the defendant to show his hands because the officers were not sure if he was armed; the defendant did not comply. Officer Ward testified that the defendant was wearing only shorts and that his muscles were tensed. He was sweating profusely, breathing hard, and rocking back and forth as he screamed. Officer Ward stated that he approached the defendant, ordered him to get up, and grabbed his left hand to secure his attention. The defendant then sprang up and began charging Officer Ward, swinging with his closed fists. Officer Ward testified that the defendant's eyes "locked" on him and that his actions appeared intentional. Both Sergeant Woodcock and Officer Melton testified that they saw the defendant lunge at Officer Ward in an aggressive manner. Officer Ward backed up. All three testified that Officer Ward attempted to use his taser on the charging defendant, but the taser was unsuccessful. Officer Ward testified that he tried to "drive-stun" the defendant by deploying the taser in direct contact with the defendant but that this was also ineffective.

At this point, Officer Melton commanded his dog to apprehend the defendant. The dog bit the defendant, and the defendant kicked the dog several feet into the air. The dog bit the defendant again, and the defendant began to punch the dog with closed fists. Meanwhile, Officer Ward was attempting to handcuff the defendant and succeeded in getting the handcuffs secured on one of the defendant's arms. Officer Melton testified that the defendant was trying to get free, and in doing so, he brought his arm around, hitting Officer Ward in the face with the unsecured section of the handcuffs. Officer Ward testified that the defendant wrestled his arm from Officer Ward's grasp and tried to punch him, cocking his fist back before hitting. Officer Ward was able to dodge the defendant's fist but got hit with the handcuff on the bridge of the nose. Officer Ward testified that the blow was hard enough that he "saw stars." Officer Melton testified that the defendant resisted so much that the confrontation was "the worst fight I've seen any officer in."

All three officers testified that Sergeant Johnson then deployed the taser again, "drive-stunning" the defendant. Sergeant Woodcock testified that it incapacitated the defendant. Officer Ward, however, stated that this deployment of the taser was also ineffective. Eventually Officer Ward and Sergeant Johnson were able to work together to handcuff the defendant. Officer Melton testified that he called off the dog when the defendant was handcuffed. All three testified that the defendant continued to resist and had

to be carried from the woods. Suspecting that the defendant was in a stimulant-induced delirium, Officer Ward summoned an ambulance. The defendant had to be restrained while in the ambulance, and he did not stop resisting until medical staff at the hospital gave him a sedative. Sergeant Woodcock spoke again with the victim, who was still visibly upset. He noted a bruise on her left arm but did not call an ambulance because her injuries were not that severe. He looked at her neck and did not see strangulation marks.

At the close of the State's proof, the trial court granted a judgment of acquittal on the aggravated assault charge based on the victim's testimony that she was not choked and on the lack of physical evidence of any strangulation. The trial court noted that it would instruct on the lesser-included offense of assault by bodily injury in Count 1. There was no objection against this instruction, which was ultimately given to the jury.

The defendant testified in his own defense. According to the defendant, his memory of the night was "in and out." He testified that he did not intend to strike anyone or to resist arrest that night. The defendant stated that he had been drinking liquor and beer all day and that he had consumed cocaine. He confirmed the victim's testimony that he was jealous of the victim's ex-boyfriend and accused her of cheating. He recalled feeling suddenly very hot and then believing that somebody was trying to "get" him or was "after" him. He confirmed the victim's testimony that he put his arm around her but was not trying to attack her. He denied hitting the victim. The defendant described his state of mind: "When I got at – when I thought somebody was trying to hurt me and [the victim], I didn't. It didn't click. That's why I took off. I was like, '*What have I just done?[] What happened?*'" He confirmed that the victim locked him out and that he broke down the door. He stated that he did not touch the victim after breaking down the door, although he started to follow her outside. Instead, he tried to seek help at the neighbor's house and then lay down in the woods. He recalled feeling "burning up" but did not remember yelling.

The defendant testified that he was lying in the woods when something started "eating [him] up." He was not aware that police had arrived and did not know he had been ordered to get up. The defendant denied charging Officer Ward. He stated that he first became aware that an animal was biting him and that he simply tried to fight the animal off and get away from the pain. He denied cocking his fist back or trying to hit law enforcement. He recalled five electrical shocks and stated that officers dragged him to the road while the dog continued to attack. The defendant testified that officers threw him on the road in front of a police car and only at that point called off the dog. He agreed that the dog was on a leash. On cross-examination, the defendant agreed he was mad at the victim, but he denied being enraged. He acknowledged yelling at her and grabbing her belt.

The jury convicted the defendant of the lesser-included offense of assault of the victim

-5-

in Count 1;[1] the assault of Officer Ward in Count 2; the domestic assault of the victim in Count 3; and resisting arrest in Count 6. At the sentencing hearing on January 14, 2014, the prosecutor told the trial court that the trial court had dismissed the aggravated assault charge in Count 1 at the close of the State's proof; the prosecutor told the trial court that "the jury must not have understood that" because it returned a verdict of guilty on Count 1 and assessed a fine. In fact, the trial court had not dismissed the charge but had granted a motion of acquittal on the greater offense of aggravated assault and permitted the lesser-included offense of assault to go to the jury. At the close of the hearing, the trial court delivered sentences from the bench. The defendant was sentenced to eleven months and twenty-nine days of imprisonment for the conviction of assault of a law enforcement officer, eleven months and twenty-nine days of imprisonment for the conviction of domestic assault, and five months and twenty-nine days of imprisonment for the conviction of resisting arrest, all to be served concurrently with one another but consecutive to a prior six-year sentence. On January 27, 2014, the judgments were entered; the judgment form for Count 1, in which the jury returned a conviction for assault of the victim by bodily injury, showed that Count 1 had been dismissed.

In the motion for a new trial,[2] the defendant raised only one issue: the sufficiency of the evidence for the domestic assault conviction. The defendant argued that the evidence was insufficient because the victim testified that she was not in fact in fear. On appeal, the defendant also asks for plain error review of the claim that he is entitled to a new trial because the trial court should not have instructed the jury on the lesser-included offense of simple assault when it acquitted him of the aggravated assault charge.

## ANALYSIS

### I. Sufficiency of the Evidence

Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding beyond a reasonable doubt. The appellate court must determine whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). When the defendant challenges the sufficiency of the evidence, the appellate court may not reweigh

---

[1]The parties agreed that this offense would merge with domestic assault if the defendant should be convicted of both.

[2]The defendant's trial attorney filed this motion prior to moving to withdraw from the case. The defendant's newly appointed attorney argued the motion and raised no additional issues.

the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 278-79 (Tenn. 2000). The jury's verdict of guilt, approved by the trial court, accredits the testimony of the State's witnesses and resolves all conflicts of evidence in the State's favor. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* The State is afforded the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). A conviction may be supported by circumstantial evidence alone, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). "The jury must decide the significance of the circumstantial evidence as well as '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" *State v. Adams*, 405 S.W.3d 641, 662 (Tenn. 2013) (quoting *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)).

The defendant challenges his conviction for domestic assault. A person commits domestic assault when he or she commits an assault against a domestic abuse victim, which includes an adult whom the offender is dating. T.C.A. § 39-13-111(a)(3), (b) (2010). As charged in the indictment, assault is accomplished when the defendant intentionally or knowingly causes another to reasonably fear imminent bodily injury. T.C.A. § 39-13-101(a)(2). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(2).

The defendant argues that the victim never stated that she was afraid of bodily injury. He also notes that she explained that she called 911 to summon help for the defendant rather than for protection against him and that she locked the door and left the house so that she could summon police to his aid. However, viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that the defendant intentionally or knowing caused the victim to fear imminent bodily injury. The evidence shows that the defendant became jealous of the victim's ex-boyfriend and accused her of infidelity. He began to follow her around the house, yelling at her and grabbing her. The defendant acknowledged that he felt mad at the victim. Although the defendant emphasizes those parts of the victim's testimony in which she stated she was not frightened, reviewing the sufficiency of the evidence requires us to resolve all conflicts of evidence in the State's favor. The victim stated that the defendant's actions "would frighten anybody." She also

agreed that she was "scared enough that [she] locked the door when he went out of [the] house." The jury presumably credited her testimony that she was frightened rather than her testimony that she was not frightened.

Furthermore, the reasonable and legitimate inferences to be drawn from the evidence also support the conclusion that the victim reasonably feared imminent bodily injury. After the defendant had grabbed the victim, she took advantage of his momentary absence from the house to lock the door with a deadbolt. When the defendant managed to break through the lock, she went to the back yard and called 911. The jury was entitled to make the reasonable inference that her actions sprang from a fear of imminent bodily injury. Furthermore, the victim's fear of imminent bodily injury was reasonable: the victim acknowledged she suffered bodily injury, consisting of a bruise, during the confrontation. *See* T.C.A. § 39-11-106(2). While the victim also testified that the defendant was not violent toward her and that she was not afraid of him, the jury was entitled to credit instead those parts of her testimony where she acknowledged that she was afraid, and the jury was entitled to draw the reasonable inference that she was afraid from her acts of locking the door, fleeing, and summoning help. Accordingly, the evidence is sufficient to sustain the conviction for domestic assault. We have reviewed the defendant's other convictions and conclude that the evidence is likewise sufficient to support them.

## II. Lesser Included Offense in Count I

The defendant next asks us to conduct a plain-error review of the trial court's decision to charge the jury on Count 1 with the lesser-included offense of simple assault after the court had granted a judgment of acquittal on the greater offense of aggravated assault by strangulation. *See* T.C.A. § 39-13-101(a)(1); -102(a)(1)(A)(iv). The defendant contends that the jury instructions, which asked the jury to consider whether the defendant was guilty of committing assault against the victim by intentionally, knowingly, or recklessly causing bodily injury to her, infected the entire process of jury deliberations, entitling him to a new trial.[3]

The State, in its brief, "concedes now, just as it did prior to the … hearing" that the instruction was in error. This concession appears to be erroneous, and we are not bound by it. *See State v. Franklin*, 308 S.W.3d 799, 811 (Tenn. 2010); *State v. Mitchell*, 137 S.W.3d 630, 639-40 (Tenn. Crim. App. 2003). The trial court, considering the motion for judgment of acquittal on the aggravated assault charge, concluded that the evidence was insufficient to support a conviction because there was no physical evidence of strangulation and the

---

[3]It is unclear if the defendant is claiming that all his convictions, or only the domestic assault conviction, were affected by this alleged error.

victim explicitly testified that she was not strangled. However, the proof at trial was sufficient to submit the lesser-included offense of simple assault by bodily injury to the jury, since both the victim and Sergeant Woodcock testified that the victim suffered a bruise during the confrontation. Because there was no error in the jury instructions, the defendant's claim of error in this regard is without relief.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgments of conviction.

_____
JOHN EVERETT WILLIAMS, JUDGE