IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2003 Session

## STATE OF TENNESSEE v. LESLIE THURMAN MITCHELL

**Direct Appeal from the Criminal Court for Knox County**
**No. 73807     Mary Beth Leibowitz, Judge**

---

**No. E2002-01537-CCA-R3-CD**
**August 1, 2003**

---

The State of Tennessee appeals the Knox County Criminal Court's suppression and exclusion of evidence in the second-degree murder prosecution of Leslie Thurman Mitchell. The evidence consists, first, of the defendant's statements to law enforcement officers pertaining to the homicide following his arrest for an unrelated matter, and second, of the defendant's wife's testimony regarding marital communication pertaining to the alleged crime. We granted the state's application for interlocutory appeal, *see* Tenn. R. App. P. 9, and upon review, we reverse the lower court's rulings.

**Tenn. R. App. P. 9; Judgment of the Criminal Court is Reversed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the Appellant, Leslie Thurman Mitchell.

Paul G. Summers, Attorney General & Reporter; Thomas E. Williams, III, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Marsha Mitchell, Assistant District Attorney General, for the Appellant, State of Tennessee.

**OPINION**

The defendant is charged with second-degree murder for the stabbing death of Juan Blanco-Guerra, which occurred on or about October 20, 2001, following an evening in which the defendant, his wife, and the victim had socialized together.

The defendant was suspected of the crime, and on or about October 21, 2001, the defendant was arrested on an outstanding child support warrant. After he was taken into custody, two Knoxville Police Department officers questioned the defendant about the death of Mr. Blanco-Guerra. The defendant gave an inculpatory statement and was ultimately indicted for second-degree murder.

Apparently, the defendant also made inculpatory statements about Mr. Blanco-Guerra's death to his wife, Kimberly Dotson, shortly after the relevant events took place. Ms. Dotson's testimony about those communications was offered at the preliminary hearing, and her testimony was potential evidence for the state in the criminal trial of the defendant.

During pre-trial proceedings, the defendant filed a motion to suppress the statements he made to Officers Jones and Moyers, a motion to suppress any statements the defendant made to his wife on the basis of the marital communications privilege, and a motion to dismiss the indictment because it was based entirely upon evidence which was violative of the marital communications privilege.

<u>Defendant's Statement to Law Enforcement Officers</u>

At the suppression hearing relative to the defendant's own statement, the state presented evidence via the testimony of the two law enforcement officers who questioned the defendant after his arrest on an outstanding child support *capias*. The first to testify was Sergeant Gary Moyers. According to Sergeant Moyers, the defendant was questioned in the early morning hours of October 21, 2001. The defendant was advised of his rights and refused to sign an advice of rights form. The defendant refused to discuss anything with the officers and asked why he was there. After being told that he was suspected of being involved in a stabbing, the defendant said something like, "I think I may need an attorney," or "I think I need an attorney." According to Sergeant Moyers, Investigator Gary Jones then advised the defendant that he would be charged with murder. The defendant asked why he would be charged, and Investigator Jones explained in detail the evidence against the defendant. The defendant then said, "I need to tell you what happened." The defendant then gave an incriminating statement, during which he became emotional. The officers left the room, allowed the defendant to compose himself, and then returned. The officers administered a second admonition of rights, obtained the defendant's signature on a waiver of rights form, and took a tape-recorded statement from the defendant regarding his involvement in the stabbing death of the victim.

Sergeant Moyers admitted that the defendant was not provided a lawyer after he mentioned that he might need one. Sergeant Moyers likewise admitted that he did not seek to clarify the defendant's statement by questioning the defendant further about whether he wanted an attorney.

The state also offered the testimony of Investigator Gary Jones. Investigator Jones affirmed that the testimony of Sergeant Moyers was consistent with his recollection of events relative to the interrogation of the defendant. Investigator Jones testified that the defendant believed he was in custody for charges relative to nonpayment of child support. Jones told the defendant that they were also investigating a murder case, and the defendant professed that he had been at home and did not know anything about the murder. Before Jones advised the defendant of his rights, the defendant asked, "Do you think I need a lawyer?" Jones replied, "That's up to you." When Jones mentioned first-degree murder charges, the defendant told Jones that he wanted to explain his side of the story. Jones then advised the defendant of his rights, and the defendant refused to sign the admonition

form. Jones claimed that he did not hear the defendant say to Sergeant Moyers, "I think I need a lawyer," although he did not dispute that this may have happened. By his own admission, Investigator Jones did nothing to procure an attorney for the defendant. Later, when the defendant indicated his willingness to talk on tape to the officers about the murder investigation, Investigator Jones heard the defendant say, "I changed my mind," when asked about his previous statement about a lawyer.

Near the beginning of the recorded statement, the following exchange occurred:

Moyers: The time is now 3:39 a.m. Leslie, earlier Gary and I were talking to you and during the process of that talking, we had in conversation, we advised you of your rights and during that conversation we had, you said that you thought that you needed to talk with an attorney, is that correct?

Defendant: Yeah. I changed my mind.

Moyers: You changed your mind. Okay, we told you that what we were investigating and the potential charges that you were looking at, is that correct?

Defendant: Yeah, that's true.

Moyers: And when we told you what the potential charges was [sic] and we explained to you the evidence we had and you asked why and all that we, we explained that to you, did we not?

Defendant: Right.

Moyers: And after that conversation we told you that you were looking at a murder charge and that the guy had died. You told us that you wanted to tell us what took place, is that correct?

Defendant: Yes sir.

Moyers: Okay. At this time, we acknowledge the fact that you do understand what your, your rights are and that you are going, are willing to talk to us at this time. We read your rights to you earlier, is that correct?

Defendant: Um hmm.

Moyers: Do you remember what they were? We'll go over them again.

Defendant:      Right to an attorney.

Moyers:         Let me, let me read them to you.

                [unintelligible because Moyers and Defendant talking simultaneously]

Defendant:      . . . have the right to an attorney.  I have the right to, you know, not to say nothing [sic] if I don't want to.

Moyers:         That's correct.  You have all those rights and you also have the right to, to, to have an attorney present.

Defendant:      Present, yeah.

Moyers:         And you understood all those, is that correct?

Defendant:      Yeah.

Moyers:         Okay, did, you did, we're gonna go over them again just to make sure that you, that you understand.

Defendant:      Or should I wait for this right here, for my attorney, cause like y'all got a written thing?

Moyers:         It just makes it more clear that, that we don't misunderstand, misunderstand, or . . . .

Defendant:      [unintelligible] I mean, I don't, I don't need no attorney.  I don't know why you even ask me that.

                [Moyers then proceeds to explain Defendant's rights to him, and Defendant acknowledges each of them.  Defendant admits that he stabbed the victim during a confrontation.]

        In support of his suppression motion, the defendant took the stand at the hearing.  He claimed that he asked why he was brought to the police station but was not told about the murder investigation.  Rather, Investigator Jones said, "You know why you're here."  The defendant claimed that he was asked questions about the homicide before he was advised of his rights.  When he was later advised of his rights, the defendant refused to sign the admonition form and said that he needed to see a lawyer.  According to the defendant's testimony, the officers did not cease discussion of the homicide at this point.  Investigator Jones told him that if he did not explain what happened, he would be charged with first-degree murder.  The defendant did not want to tell his side of the story, but as the discussion continued, Sergeant Moyers made him feel like what had happened would be

more or less understandable. The defendant decided to tell the officers about the homicide. The defendant admitted that although he was very emotional, no one forced him to give a statement. The defendant claimed that he had been confused when he said he changed his mind about talking to an attorney.

Following hearings, the court suppressed the defendant's statements.[1] The state sought permission to pursue an interlocutory appeal, which this court and the lower court granted.

## Defendant's Statements to His Wife

The lower court also had before it the defendant's motion (1) to exclude evidence of the defendant's statements to his wife about the alleged crime, and (2) to dismiss the indictment because it was returned based entirely upon such evidence, which violates the marital communications privilege.

The lower court conducted a hearing at which Kimberly Dotson testified that she had been married to the defendant since October 30, 1998. At the time of the hearing, Ms. Dotson had not filed for divorce because she could not afford to do so, but she was saving money for that purpose. Ms. Dotson recounted that she and the defendant had been separated for approximately six months in October 2001 and had seen each other three or four times during the separation. Although they were working towards reconciliation, they were not living together. For two to three days prior to October 19, which was Ms. Dotson's birthday, the defendant spent the night at Ms. Dotson's residence. They engaged in sexual relations on October 19 prior to going out in the evening.

Ms. Dotson did not testify in any detail about the events leading up to Mr. Blanco-Guerra's death. However, she testified that after Mr. Blanco-Guerra left her home, the defendant told her that he had been upset by the way the victim had touched Ms. Dotson's bottom during their earlier visit to a nightclub. Ms. Dotson asked about Mr. Blanco-Guerra's whereabouts, and the defendant said that he "killed the m---- f-----." Ms. Dotson asked, "You for real? [sic]" The defendant responded, "No, I know I didn't; I just stabbed him right here in his shoulder." According to Ms. Dotson, the marriage was "over" once this conversation transpired. However, Ms. Dotson also testified that they later went to bed and spent the night together but did not have sexual relations until the next day when, according to Ms. Dotson, "[the defendant] took the sex from me."

Based upon this evidence, the lower court ruled that any statements the defendant made to Ms. Dotson regarding the alleged crime were privileged marital communications that could not be used as evidence in the prosecution of the defendant. It does not appear from the record that the court ruled on the motion to dismiss.

---

[1] Initially, the lower court denied the motion to suppress the defendant's statements to law enforcement. Upon motion to reconsider, however, it reversed the earlier ruling and suppressed the statements.

The state sought permission to pursue an interlocutory appeal of the marital communications ruling, which this court and the lower court granted.

Both the suppression and exclusion issues have now been presented by the parties in their briefs and oral arguments, and they are before us for disposition.

**I**

We consider first the suppression of the defendant's statements given to Officers Jones and Moyers of the Knoxville Police Department.

This case presents issues which are interesting both legally and factually. Legally, the issue is whether law enforcement officers have any duty to inquire and clarify when a suspect makes an ambiguous statement regarding his desire for counsel. Factually, the issue is whether the defendant's statements regarding his desire for counsel were ambiguous.

With respect to these issues, the state takes the position that the defendant's statements about counsel were equivocal; therefore, Officers Moyers and Jones had no duty to inquire. Further, the state argues that the defendant then initiated discussion of the crime, effectively waiving his right to counsel. The defendant, however, posits that he first made an equivocal statement when he asked, "Do you think I need a lawyer?" He claims he then made an unequivocal assertion of his right to counsel when he said, "I think I need an attorney." In light of the second, allegedly unequivocal statement, the defendant argues that it is unnecessary for this court to determine whether there was a duty to clarify the first statement, for the reason that the officers clearly breached their duty to cease questioning upon an unequivocal statement of a desire for counsel.

We begin with consideration of the legal issue. Under the United States Constitution, an ambiguous invocation of a suspect's right to counsel does not trigger any duty that the interrogating officer stop substantive questioning of the suspect and clarify the suspect's desire regarding counsel. *Davis v. United States*, 512 U.S. 452, 460-61, 114 S. Ct. 2350, 2355 (1994). Under the Tennessee Constitution, however, the question is not so easily answered.

The Tennessee Supreme Court most recently addressed the issue as a matter of state constitutional law in *State v. Stephenson*, 878 S.W.2d 530, 548 (Tenn. 1994), which was decided prior to *Davis*. In *Stephenson*, Tennessee's high court held that the state and federal constitutions require that when a suspect makes an equivocal statement about the need for an attorney, the law enforcement officer must limit further questioning to clarifying whether the suspect wanted an attorney. *Stephenson*, 878 S.W.2d at 548.

Two years after *Stephenson*, the Tennessee Supreme Court considered the issue as a matter of federal constitutional law in *State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996). The court acknowledged the interim *Davis* holding that a suspect "must articulate his desire to have

counsel present sufficiently clearly that a reasonable officer [in the circumstances] would understand the statement to be a request for an attorney" and that absent such an unambiguous statement, substantive questioning need not cease. *Huddleston*, 924 S.W.2d at 670 (quoting *Davis*, 512 U.S. at 458, 114 S. Ct. at 2355). Without commenting on the bearing, if any, that the Tennessee Constitution had on the issue or overruling *Stephenson*, the court held that the facts in *Huddleston* did not present a case in which the defendant made an unambiguous request for counsel. *Id*.

The question of the effect of the Tennessee Constitution is a significant one. This court has held that Article I, section 9 of the state constitution provides, in some respects, broader protections of a suspect's individual rights than does the Fifth Amendment. *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996) (citing *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992)). In the wake of the Tennessee Supreme Court's silence in *Huddleston* on the issue as a matter of state constitutional law, this court has struggled to define the parameters of a suspect's rights under Tennessee constitutional law. *See, e.g., State v. Gerald E. Saylor*, No. E2001-00604-CCA-R3-CD , slip op. at 7-10 (Tenn. Crim. App., Knoxville, July 11, 2002), *perm. app. granted* (Tenn., Dec. 2, 2002); *Slater Belcher v. State*, No. E1999-02287-CCA-R3-PC, slip op. at 4-5, concurring slip op. at 1 (Tenn. Crim. App., Knoxville, Oct. 10, 2001), *perm. app. denied* (Tenn. 2002); *State v. James Clayton Young, Jr.*, No. 01C01-9605-CC-00208, slip op. at 22-29 (Tenn. Crim. App., Nashville, May 22, 1998); *State v. Jack Jay North, Jr.*, No. 02C01-9512-CC-00369, slip op. at 25-31 (Tenn. Crim. App., Jackson, Dec. 9, 1996), *perm. app. denied* (Tenn. 1997).

Recently, a panel of this court interpreted *Huddleston* to overrule *Stephenson* relative to the equivocal request for an attorney under the Tennessee Constitution. *Gerald E. Saylor*, slip op. at 10. That panel noted that its interpretation of *Huddleston*'s effect on *Stephenson* was consistent with decisions of other panels of this court. *Id.* (citing *James Clayton Young, Jr.* and *Jack Jay North, Jr.*); *cf. State v. Kerry L. Dowell*, No. M2002-00630-CCA-R3-CD (Tenn. Crim. App., Nashville, June 27, 2003) (following *Huddleston*'s rule that unambiguous request for counsel is necessary to foreclose further questioning, without discussing its effect on *Stephenson*). The Tennessee Supreme Court has accepted review of *Saylor*; in the interim, we agree with the result reached by the *Saylor* panel of this court.

Thus, the defendant in this case is entitled to suppression of his statement if he unequivocally requested counsel and that request was not honored.

The lower court interpreted the defendant's statements about counsel to be ambiguous. The lower court analogized the facts to those of *Stephenson*, in which the suspect made an equivocal statement regarding his desire to have counsel. The lower court found that the defendant declined to sign a rights waiver, inquired whether the interrogating officers thought he needed a lawyer, and made statements such as "I think I need a lawyer." It further found that the officers had a duty to clarify the request for counsel, which they failed to do. Rather, they pursued a discussion of the basis for the charge. Based upon the lack of clarification and the further substantive discussion, the lower court suppressed the defendant's statement.

The lower court's determination that the defendant made equivocal statements about counsel is a question of fact. *State v. Darryl Gene Farmer*, No. 01C01-9804-CC-00166, slip op. at 3 (Tenn. Crim. App., Nashville, Apr. 23, 1999) (citing *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996)), *perm. app. denied* (Tenn. 1999); *see also State v. Gdongalay P. Berry*, No. M2001-02023-CCA-R3-DD, slip op. at 15 (Tenn. Crim. App., Nashville, Apr. 10, 2003), *app. docketed* (Tenn. Apr. 28, 2003); *State v. Wayne Joseph Burgess, Jr.*, No. M1999-02040-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Nashville, Jan. 18, 2001), *perm. app. denied* (Tenn. 2001). The lower court's findings of fact are binding on this court unless the evidentiary record preponderates to the contrary. *Darryl Gene Farmer*, slip op. at 3 (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). In this case, the evidence of record does not so preponderate. The defendant had a duty to "articulate his desire to have counsel present sufficiently clearly that a reasonable officer [in the circumstances] would understand the statement to be a request for an attorney." *Huddleston*, 924 S.W.2d at 670 (quoting *Davis*, 512 U.S. at 458, 114 S. Ct. at 2355). The lower court found that the statements attributed to the defendant fell short of such articulation. We defer to the lower court's factual determination that the defendant's statements regarding counsel were equivocal.

The next step is application of the law to the lower court's factual determination. In this respect, we hold that the lower court erred. As stated above, we believe that *Stephenson*, upon which the lower court relied, was implicitly overruled by *Huddleston* and that the correct analysis is that which is embodied by the principles of *Huddleston* and *Davis*. Those cases support a conclusion that Officers Moyers and Jones had no duty to curtail substantive questioning of the defendant when he made equivocal statements regarding his desire for counsel. Moreover, the officers had no duty to clarify the defendant's statements before continuing with substantive questioning about the crime under investigation. Accordingly, the defendant's inculpatory statement was not properly subject to suppression on this basis. The lower court's order suppressing the statement is reversed.

## II

We now consider the lower court's ruling excluding evidence of the defendant's statements to his wife about the alleged crime. This issue requires us to examine the law relative to the marital communications privilege. The rule relative to that privilege is defined by statute, which says

In a criminal proceeding a marital confidential communication shall be privileged if:

(A)    The communications originated in a confidence that they will not be disclosed;
(B)    The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;
(C)    The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and
(D)    The injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation.

Tenn. Code Ann. § 24-1-201(c)(1)(A) - (D) (2000).  If a communication is found to be privileged, it is inadmissible upon objection of either spouse.[2]  *Id.* § 24-1-201(c)(2) (2000).

The lower court found that all four factors existed and ordered suppression of the defendant's statements to his wife about the alleged crime.  On appellate review, we must defer to the lower court's findings of fact that all four factors exist unless the evidence preponderates to the contrary.  *See State v. Price*, 46 S.W.3d 785, 802 (Tenn. Crim. App. 2000), *perm. app. denied* (Tenn. 2001).

Resolution of this case turns on whether the time of analysis for the presence or absence of the four factors is when the communication occurs or at the time of the trial court's inquiry into the application of the privilege.  That determination is critical where, as here, the marriage was in a very different state at the time of the marital communication than it is when the trial court later rules on the applicability of the privilege.  For the reasons that follow, we hold that factor (A) focuses on the expectation of the communicating spouse at the time of the communication, whereas assessment for the presence of factors (B), (C) and (D) must be done from the facts as they exist at the time of the trial court's ruling.

Factor (A) considers whether "[t]he communications originated in a confidence that they will not be disclosed."  Tenn. Code Ann. § 24-1-201(c)(1)(A) (2000).  Because the straightforward language of this factor focuses on when the communication "originated" and uses past tense language, we conclude that this factor requires the trial court to consider the intent and belief of the parties to the communication at the time of the communication.  *See State v. Gosnell*, 62 S.W.3d 740, 747 (Tenn. Crim. App.) (evaluating subjective intent of spouses regarding confidentiality at time of surreptitiously recorded conversation), *perm. app. denied* (Tenn. 2001).

Unlike factor (A)'s focus on the communication itself, the remaining three factors focus on the relationship of the parties and the effect on the relationship of spousal testimony about marital communications.  A second distinction is that these factors use present-tense language -- focusing on whether confidentiality *is* essential to the relationship, the relationship *ought* to be sedulously fostered, and injury from disclosure *outweighs* the benefit of correct disposition of the litigation.  *See id.* § 24-1-201(c)(1)(B) - (D).  From this, we conclude that the trial court must conduct its inquiry relative to factors (B), (C), and (D) by assessing the present status of the marital relationship at the time it is called upon to do so, rather than at the time of the communication in question.

This is consistent with the historic purpose of the privilege at common law, which was to foster "the sacredness of the home and the peace of families."  *State v. Price*, 46 S.W.3d 785, 799 (Tenn. Crim. App. 2000) (citing *McCormick v. State*, 135 Tenn. 218, 186 S.W. 95, 97 (1916)), *perm. app. denied* (Tenn. 2001).  Recognition of the privilege will tend to promote continued marital harmony, provided it exists at the time that the spouse is called upon to testify; however, recognition

---

[2]There are certain exceptions, which are not pertinent here.  *See* Tenn. Code Ann. § 24-1-201(c)(2) (2000).

of the privilege would do nothing to promote marital harmony which does not already exist, even if it did at some previous time.

We are likewise persuaded by the decision of a panel of this court in *State v. Price*. The panel in that case considered the effect that spousal testimony would have on the *current* state of the marriage, finding that "the defendant's marriage was already failing, whether his wife testified at this trial or not." *Id.* at 802. Although this finding was made relative to factor (D), we find it persuasive with respect to factors (B) and (C), as well, given the previously mentioned similarities among factors (B), (C), and (D). *But cf. State v. Ralph C. Hauck*, No. 01C01-9105-CR-00151, slip op. at 5-6 (Tenn. Crim. App., Nashville, Apr. 16, 1992) (factors (B) and (C) do not exist where defendant via force or threat of harm seeks to involve witness-spouse in ongoing criminal enterprise for which defendant is on trial; focusing on relationship at time of communication), *perm. app. dismissed* (Tenn. 1992).

Turning, then, to the case at bar, the state concedes that factors (A) and (C) are present but claims that the lower court erred in finding that factors (B) and (D) apply. We believe that the state's concession regarding factor (A) is apt; we disagree with respect to factor (C). Considering first factor (A), the record supports the lower court's conclusion that the defendant made statements to his wife in confidence that they would not be disclosed. The defendant and his wife were discussing their marital situation, including Ms. Dotson's behavior with the victim, when the defendant made inculpatory admissions. This occurred at a time when they were attempting to reconcile their differences in furtherance of their marital relationship. Up until the time that the defendant made the inculpatory admissions, it was Ms. Dotson's desire to reconcile her differences with the defendant and maintain the marital relationship.

We disagree with the state that the record supports the lower court's finding with regard to factor (C) that the relation was one which, by community standards, should be sedulously fostered. At the time of the hearing, the defendant and Ms. Dotson were estranged. Ms. Dotson wanted to divorce the defendant after he confessed his involvement in Mr. Blanco-Guerra's death, and only her financial situation kept her from doing so. Given these circumstances, it cannot be said that community opinion would be that this relationship should be encouraged and maintained.

We now turn to the contested portion of the issue, that is, whether the evidence preponderates against the lower court's findings that factors (B) and (D) exist. Factor (B) exists when "[t]he element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties." Tenn. Code Ann. § 24-1-201(c)(1)(B) (2000). On this point, the lower court found, "[T]he relationship between the parties and their marriage was the reason for the conversation. The element of the confidential communication that bound them together. [sic]" In advocating that this factor does not exist, the state points to evidence that Ms. Dotson's marriage to the defendant "had been languishing for six months prior to his confession to her" and was "over with" once she learned of the homicide. Further, the state highlights Ms. Dotson's testimony that she had not yet initiated divorce proceedings because she could not afford to do so, but she was saving money for that purpose. The defendant claims that the lower court correctly found that factor

(B) existed based upon evidence that the continued maintenance of the marital relationship was what caused the conversation to occur, and further, Ms. Dotson voluntarily slept with the defendant after the conversation took place.

The evidence demonstrates that at the time of the lower court's ruling, the Dotson/Mitchell marriage was not one in which confidentiality of the previous, inculpatory communications was essential to full and satisfactory maintenance of the relationship. To be sure, the parties were separated, Ms. Dotson had harbored no desire for reconciliation since learning that the defendant was involved in Mr. Blanco-Guerra's death, and Ms. Dotson was saving money for a divorce. Thus, the lower court erred in finding the presence of factor (B).

Finally, factor (D) requires consideration of whether "[t]he injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation." *Id.* § 24-1-201(c)(1)(D) (2000). In the present case, the lower court focused on the fact that although the defendant and Ms. Dotson were separated, they "would have continued to work on reconciliation in the marriage had these incidents not occurred." However, as we have discussed above, we believe the proper point in time for evaluating the potential for injury to the marriage is at the time of the trial court's ruling. *See Price*, 46 S.W.3d at 802. Had the lower court examined the state of the defendant's marriage at the time of the hearing, it would have concluded that the marriage was over, with lack of money being the only reason that Ms. Dotson had not yet filed for divorce. In this situation, the benefit gained from the correct disposal of the litigation would far outweigh the damage to the marital relationship. Thus, the lower court erred in finding that factor (D) existed.

Based upon the absence of factors (B), (C), and (D), we hold that the lower court erred in ruling that Ms. Dotson's testimony regarding the defendant's inculpatory statements should be excluded based upon the marital communications privilege.

We have reached this conclusion notwithstanding the defendant's attempt to place evidence before us that he and Ms. Dotson have reconciled since the evidentiary hearing. On the day of oral argument in this court, defense counsel filed a "Motion for Consideration of Post-Judgment Fact." The motion is based upon facts contained in an order of the trial court pertaining to the defendant's bond, in which the trial court recites that the defendant and Ms. Dotson have reconciled. The trial court order was entered *nunc pro tunc* October 14, 2002, several months after the hearing and ruling on admissibility of the marital communication evidence. The state filed a response vigorously opposing this court taking notice of this fact. The state concedes the relevance of the information to the merits of the issue, but it contends that consideration of such factual information is improper under Tennessee Rule of Appellate Procedure 14. *See* Tenn. R. App. P. 14, Advisory Comm'n Comments ("[Rule allows the appellate court to consider post-judgment facts,] unrelated to the merits and not genuinely disputed, [which] are necessary to keep the record up to date. . . . This rule is not intended to permit a retrial in the appellate court."); *see also Book-Mart v. National Book Whse.*, 917 S.W.2d 691, 693 (Tenn. Ct. App. 1995); *Town of Dandridge v. Patterson*, 827 S.W.2d 797, 802 (Tenn. Ct. App. 1991).

Given the scope of Rule 14 and the interlocutory nature of this appeal, we do not believe it proper for us to consider any information of a matrimonial reconciliation occurring after the hearing on the admissibility of the marital communication evidence. Rather, we view the issue before us to be limited to the propriety of the lower court's ruling *on the evidence that was before it*. Should either party desire that the lower court take into account new evidence and revisit the ruling as it stands following remand, that party may direct a motion to the lower court to do so. At such time, the lower court will have the opportunity to hear evidence on the then-existing state of the marriage.

In conclusion, we reverse the lower court's ruling suppressing the defendant's statement to law enforcement officers. We likewise reverse the lower court's ruling excluding Ms. Dotson's testimony about the defendant's inculpatory statements to her. The matter is remanded to the lower court for further proceedings consistent with this opinion.

_____
JAMES CURWOOD WITT, JR., JUDGE