FILED

04/21/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2017 Session

**MYRON LORENZO JOHNSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-A-396      Mark J. Fishburn, Judge**
_____

**No. M2016-01361-CCA-R3-PC**
_____

A Davidson County jury convicted the Petitioner, Myron Lorenzo Johnson, of first degree felony murder, first degree premeditated murder, and especially aggravated robbery. The trial court merged the convictions for first degree premeditated murder and felony murder and ordered an effective sentence of life imprisonment plus sixty years. On appeal, this Court affirmed the trial court's judgments. *See State v. Myron Lorenzo Johnson*, No. M2008-02198-CCA-R3-CD, 2010 WL 521028, at *1 (Tenn. Crim. App., at Nashville, Feb. 12, 2010), *perm. app. denied* (Tenn. May 12, 2010). The Petitioner then filed a post-conviction petition in which he alleged that his trial counsel was ineffective, and the post-conviction court denied relief following a hearing. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Myron Lorenzo Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

On direct appeal, this Court summarized the evidence presented at the Petitioner's trial as follows:

On July 22, 2001, Detective Brad Corcoran with the Nashville Metropolitan Police Department was called to the scene of an abandoned truck off Old Hickory Boulevard. The body of the victim, Eugene "Juan" McAdams, was discovered in the bed of the truck covered with a white sheet; his ankles and wrists had been duct-taped. Following an autopsy, the cause of death was determined to be asphyxia and blunt force trauma to the head.

Initially, investigators were unable to develop a suspect. Several years later, Alvin Stokes, aka "Brother Gold," was facing federal drug trafficking charges. In the hopes of receiving favorable consideration on his sentence, Stokes provided Detective Derry Baltimore with the names of the [Petitioner], Christopher Nunley, and Paul Anderson as the possible perpetrators of the killing of the victim. Detective Baltimore interviewed Nunley on February 17, 2005. Nunley took Det. Baltimore to the house where the murder occurred, and Det. Baltimore also verified Nunley's phone number. After interviewing Nunley, Det. Baltimore proceeded to interview Anderson on May 12, 2005. Anderson provided details about the murder of the victim.

Anderson testified against the [Petitioner] at trial. Anderson stated that he met the [Petitioner] in 2000, and the two became good friends. Anderson moved into the [Petitioner]'s girlfriend's house, and Anderson confirmed that he was drug addict during this time. He had also met Nunley on at least two occasions prior to the murder and knew him as "Skinny." According to Anderson, the [Petitioner] and Nunley were involved together in the sale of drugs, and they often went to Stokes to get drugs.

On July 20, 2001, around 10:00 a.m., the [Petitioner] came over to the place where Anderson was temporarily residing. The [Petitioner] made a proposition to Anderson: In exchange for $500 and an ounce of cocaine, Anderson was to set up a drug deal with the victim and rob him of his drugs and money.

Anderson stated that the [Petitioner] and Nunley were angry with the victim because he had tried to go around them in the drug trade; normally, they would purchase cocaine from the victim for $22,000 and then sell it for $26,000. However, the victim had slipped a note into the cocaine,

- 2 -

providing a cell phone number and stating to the second buyer to deal with the victim directly. Anderson did not know the victim prior to July 20.

Nunley called the victim and arranged the deal. The plan was for Anderson to arrive to purchase four ounces of cocaine from the victim, but instead he would rob everyone. They were to later split the drugs and money. The [Petitioner] arrived in his truck with Nunley around 7:00 p.m. that evening to pick up Anderson, and they went to Nunley's house. However, the [Petitioner] and Nunley stated that they wanted to change the amount to eighteen ounces, "a half of key." Anderson no longer wanted to participate because he feared that there would be repercussions for stealing such a large amount of cocaine. The [Petitioner] instructed him to be quiet and sit down; Anderson complied. Nunley phoned the victim requesting the increased amount of cocaine.

While they were waiting on the victim to arrive, the [Petitioner] went out to his truck and retrieved a shotgun and a white bag. Inside the bag was a box of latex gloves. The [Petitioner] placed the bag and the gloves on the top of the refrigerator. The victim then entered the house and asked Anderson, "Do you want to buy some dope?" According to Anderson, the [Petitioner] then jumped up from the table and hit the victim in the head with the butt of the shotgun, rendering the victim unconscious. As soon as the victim fell to the floor, Nunley put on a pair of gloves and began wrapping duct tape around the victim's head. The [Petitioner] also put on gloves. They taped the victim's head "completely up," also taping his hands and feet. When the victim started to come to, he was unable to breathe and began "flopping around just like a fish dying . . . ." The victim soon ceased moving.

The [Petitioner] then removed a gold necklace from around the victim's neck. The [Petitioner] went outside to the victim's truck; meanwhile, Nunley was cleaning up blood on the floor. Thereafter, they carried the victim to a bedroom window and pushed him out the window into the bed of the victim's truck. Nunley handed the [Petitioner] a sheet, which he wrapped around the victim. The men then left the house; Nunley driving the victim's truck, and the [Petitioner] driving his truck with Anderson as a passenger. They drove to Old Hickory Boulevard near Blueberry Hill and left the truck on the side of the road. The [Petitioner] took the victim's compact disc case out of his truck. Nunley got into the [Petitioner]'s vehicle, and they returned to the [Petitioner]'s girlfriend's house. The [Petitioner] and Anderson showered, and the [Petitioner]

collected their clothes. Nunley then left after receiving his share of the cocaine; the [Petitioner] took Anderson back to Anderson's place. The next day, the [Petitioner] gave Anderson cocaine and money and rented Anderson a room in a local motel. Anderson later told Stokes about the murder.

In September 2007, the [Petitioner] and Anderson were being transported on a bus together. Anderson was in protective custody, separated from the [Petitioner] by a cage. The [Petitioner] yelled threats at Anderson, warning him not to testify against him. Inmate Timothy Flener was present on the bus and heard these threats. He was also placed in a cell with the [Petitioner] following the bus ride, and the [Petitioner] told Flener that he and Anderson were involved in a murder together.

The [Petitioner]'s wife and former girlfriend in July 2001, Tammi Renee Battle, was shown a box of gloves. She confirmed that the box in the photograph was the same type of gloves that she had brought home from work.

Medical Examiner Dr. Thomas Deering testified as to the victim's cause of the death. He also stated that, when a person was losing the ability to breathe, they might start thrashing around.

A check of Nunley's phone records showed that Nunley phoned the victim on the day of his murder. The victim's phone records revealed that the victim had phoned Nunley several times the evening he was murdered.

Jafton Richardson, an inmate serving a sentence for practicing law without a license, testified that, while incarcerated, the [Petitioner] told him he was involved in a homicide at Nunley's house. The [Petitioner] relayed that there was a phone call to the victim, and he was to meet with them at the house for a drug deal. However, they intended to rob him of his drugs and weapons, but instead the victim was hit in the head with the butt of a shotgun and died. The [Petitioner] also stated that he wore gloves during the robbery and that he got the gloves from his wife who worked at a hospital. According to Richardson, the [Petitioner]'s attitude about the murder was "nonchalant."

Later, the [Petitioner] came to Richardson in jail and asked him to sign an affidavit that the [Petitioner] had never spoken to him about the

- 4 -

murder. Richardson complied because he feared for the safety of his family.

The [Petitioner] testified on his own behalf, asserting that he had no involvement in the murder of the victim. He denied that he ever knew the victim, asserted that he never sold drugs, and claimed that he never owned a shotgun.

*State v. Myron Lorenzo Johnson*, No. M2008-02198-CCA-R3-CD, 2010 WL 521028, at *1 (Tenn. Crim. App., at Nashville, Feb. 12, 2010), *perm. app. denied* (Tenn. May 12, 2010)

At the post-conviction hearing, the Petitioner testified that Counsel represented him from 2005 to 2008. He described their communication during this time period as "not much." The Petitioner was housed at the Turney Center at the time, approximately an hour's drive from Nashville. He recalled that Counsel twice met with him at Charles Bass Correctional Complex, the first time being when he was first charged and, once again, right before trial. The Petitioner also met with Counsel at approximately thirty-five court hearings, and during four or five phone calls that were five to ten minutes each in length.

The Petitioner testified that he received a copy of the indictment and "most of the discovery." The Petitioner reviewed the discovery but stated that he and Counsel never discussed the contents of the discovery. He stated that their conversations at court mostly centered around the motion that was the focus of that court date. The Petitioner agreed that he asked Counsel questions about the evidence against him and that Counsel responded to "the best of his knowledge." Several of the witnesses that were to testify against the Petitioner were either co-defendants or persons with pending criminal charges. Counsel told the Petitioner that these witnesses' testimony "shouldn't hold up" because the witnesses were convicted felons. The Petitioner testified that Counsel never discussed strategies for impeaching these witnesses. He recalled Counsel telling the Petitioner that his charges "shouldn't stick."

The Petitioner testified that Counsel relayed the State's offer of a thirty-five year sentence to settle his case. Counsel warned the Petitioner that he could be facing more time if convicted at trial, but the Petitioner declined the State's offer. When asked whether he made a counter-offer, the Petitioner stated that it "[w]asn't up for option" because it "never came up."

The Petitioner testified that Counsel explained to him that he faced a life sentence if he was convicted at trial. He said that Counsel did not explain the stages of trial or

"how it work[ed]." The Petitioner confirmed that Counsel reviewed with him his right to call and cross-examine witnesses. Counsel explained that the Petitioner had the right to testify but advised against it. The Petitioner elected to testify at trial anyway.

The Petitioner testified that Counsel failed to interview any of the State's witnesses. He stated that his wife, Tammi Renee Battle, was forced to testify at trial despite the fact that the two were married. The Petitioner said that Counsel never discussed marital privilege with him either before or during the trial and that he only learned of it after he was convicted. He recalled that Counsel objected to Ms. Battle testifying at trial, but he was unaware of the legal basis for the objection. Counsel met with Ms. Battle before trial and was aware that Ms. Battle would confirm her statement to police that there was a gun and gloves in the Defendant's house. Despite knowing that Ms. Battle's testimony would benefit the State, Counsel never discussed ways to exclude this testimony from the trial.

The Petitioner testified that Counsel notified him that Jafton Richardson, a fellow inmate, would testify at trial; however, Counsel never spoke with Mr. Richardson in preparation for trial. Further, Counsel never discussed possible ways to exclude Mr. Richardson's testimony at trial. The Petitioner recalled that a co-defendant, Mr. Anderson, also testified against him at trial. Counsel never discussed with the Petitioner the need for corroboration as to his co-defendant's testimony. The Petitioner reiterated that Counsel should have interviewed the State's witnesses prior to trial but he failed to do so. The Petitioner also believed that Counsel might have learned information with which Counsel could have impeached the State's witnesses at trial.

The Petitioner testified that he was also represented by appellate counsel. On appeal, the only two issues raised were sufficiency of the evidence and a challenge to hearsay evidence.

On cross-examination, the Petitioner agreed that, prior to the trial, he had been convicted of other crimes. He pleaded guilty in one of the cases and the other went to trial. The Petitioner agreed that Counsel hired an investigator, Patrick Wells. The Petitioner only met with the investigator on one occasion. As to interviewing other witnesses, the Petitioner stated that the investigator only spoke with the Petitioner's wife and did not interview the other trial witnesses.

Upon further questioning by the post-conviction court, the Petitioner testified that, at the time of the 2001 homicide in this case, he and his wife lived together. In 2002, the Petitioner was incarcerated and, therefore, he and his wife could no longer live together and were separated. The Petitioner confirmed that he and his wife were still married at the time of the post-conviction hearing.

- 6 -

Counsel testified that when he received discovery in the Petitioner's case, he made copies for the Petitioner. After he was appointed as the Petitioner's attorney, he successfully sought funding to hire an investigator, Mr. Wells. Counsel also provided Mr. Wells with a copy of the discovery. Counsel stated that he met with the Petitioner "several times" but did not know the exact number. He also acknowledged that they were in court "a bunch."

Counsel testified that he provided Mr. Wells with a list of the State's witnesses, and Mr. Wells "talked to everybody that I needed him to talk to," although there were some witnesses who refused to talk with Mr. Wells. Counsel said that Mr. Wells spoke with the Petitioner's wife and that the Petitioner's co-defendants Mr. Nunley and Mr. Anderson were both represented by attorneys. Counsel recalled that Mr. Wells had an initial conversation with Mr. Richardson, "but that kind of broke down." Counsel could not remember if Mr. Wells made contact with Mr. Stokes. Counsel said that Mr. Wells prepared reports summarizing his interviews and that those reports would have been provided to the Petitioner. Mr. Wells did not create a report if a witness declined to speak with him. Counsel stated that he was unaware of any witnesses that might have been favorable to the defense.

Counsel testified that normally he would make a counter-offer if a defendant declined the State's offer to settle a case. In this case, the Petitioner never expressed any interest in settling the case. Counsel said that the Petitioner's position was that he was not at the scene of the crime; thus, the negotiation process was "curtailed."

Counsel testified that the Petitioner expressed concern over how some of the State's witnesses could testify in light of their criminal records. Counsel said that he told the Petitioner that absent a viable suppression issue, the witnesses' criminal records were a credibility issue at trial. Counsel said that, through cross-examination, he tried to illicit responses that showed "they're getting help from the State" or challenge the witness's credibility, as he did based on Mr. Anderson's and Mr. Richardson's numerous felonies.

Counsel testified that the Petitioner expressed concern about Mr. Richardson testifying because Mr. Richardson had been involved in some altercations in prison and placed in segregation because of his involvement working with law enforcement. Counsel described the source of this information as "chatter" or "scuttlebutt" and that it was not "official." He was unable to confirm this information through his investigator. Thus, Counsel could not make an argument that Mr. Richardson was "acting as an agent of the State" without confirmation of the information.

Counsel testified that he did not "do any research on" privileged communication between marriage partners. Counsel confirmed that Ms. Battle, the Petitioner's wife, did not want to testify at trial.

On cross-examination, Counsel testified that he had been a defense attorney for sixteen years and 90% of his practice involved criminal law. Counsel stated that he had represented thirty clients in homicide cases and of those he had tried four. Counsel agreed that he normally employed a defense investigator on cases and normally worked with Mr. Wells. Counsel said he told the Petitioner that Mr. Wells would be talking with all of the witnesses allowing Counsel to restrict his contact with potential witnesses. Counsel explained that this was his practice in criminal cases because if a witness said something substantive, he could call Mr. Wells as a witness at trial to impeach another witness's testimony. As to potential witnesses who are represented by an attorney, Counsel normally contacted the attorney first to gain permission. Counsel testified that approximately 70% of the time, the witnesses declined to speak with his investigator.

Counsel testified that, at trial, the questioning of Ms. Battle was limited to information that was within Ms. Battle's personal knowledge and not about conversations with the Petitioner.

Appellate Counsel testified that he had practiced law for over twenty years and 30-40% of his work was criminal appellate issues. Appellate Counsel assisted the Petitioner in filing his direct appeal and his application for permission to appeal to the Supreme Court. Most of Appellate Counsel's interaction with the Petitioner was through phone calls and letters. It was Appellate Counsel's impression that the Petitioner understood the process and Appellate Counsel's approach to the appeal.

Appellate Counsel testified that he pursued a mistrial issue and a 404(b) issue on appeal. Based upon the weight of the evidence, he did not believe there was a strong sufficiency of the evidence argument for the appeal. Because Appellate Counsel did not believe it was a legitimate issue on appeal, he did not include it.

Appellate Counsel said that he spoke with Counsel about the case prior to preparing the Petitioner's direct appeal brief. Appellate Counsel had no independent recollection of his discussion with Counsel.

After hearing the proof and the parties' arguments, the post-conviction court issued an order denying relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

The Petitioner maintains on appeal that he received the ineffective assistance of trial counsel. Specifically, he claims Counsel failed to challenge the admissibility of: (1) Ms. Battle's testimony on the basis of marital communication; (2) Mr. Richardson's testimony on the basis that he was acting as an agent of the state; and (3) Mr. Anderson's testimony on the basis that he was a co-defendant and his testimony lacked corroboration. The State responds that the post-conviction court properly denied relief for these claims. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Ms. Battle's Testimony

The Petitioner asserts that Counsel was ineffective for failing to exclude Ms. Battle's testimony at trial as marital communication. He further asserts that Appellate Counsel was likewise ineffective for failing to raise this issue on direct appeal. The State responds that Ms. Battle's testimony did not include confidential marital communications and, thus, the trial court properly admitted Ms. Battle's testimony.

In its written order denying relief, the post-conviction court made the following findings:

> Had the Petitioner been married to Ms. Battle at the time that she brought home the gloves or observed the shotgun, he might have been able to argue that these actions could constitute a communication. However, this crime occurred in July 2001 and Petitioner and Ms. Battle weren't married until October 2001. Since prong (a) evaluates the nature of the communication at the time of the communication, not at the time of trial, Petitioner fails to meet this prong. Furthermore, it is unlikely that Ms. Battle bringing home gloves and Petitioner owning a shotgun would be deemed a communication at all, much less one meant to be confidential between spouses. A marital confidence cannot exist when the marriage doesn't yet exist. Although there is no indication that Petitioner and Ms. Battle sought to divorce by the time of trial, and it appears as though their marriage was intact, prongs (b), (c), and (d) are irrelevant since prong (a) would have failed. In order to successfully claim privilege, a claimant must meet all four prongs.
>
> Since it is unlikely that any privilege claim would have been successful, it follows that [Counsel] did not act below an objective standard of reasonableness in not further pursuing this claim. He made a timely objection to Ms. Battle's testimony and had no obligation to pursue the matter further. His decision not to pursue the privilege claim further was an informed strategy based on adequate preparation, and ultimately the defendant was not unfairly prejudiced by this decision. Confidence in the outcome of this case is not undermined by Ms. Battle being allowed to testify. This issue is without merit.

Tennessee's marital communication privilege is codified at Tennessee Code Annotated section 24-1-201(c)(1) (2009), which provides:

(1) In a criminal proceeding a marital confidential communication shall be privileged if:

(A) The communications originated in a confidence that they will not be disclosed;

(B) The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;

(C) The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and

(D) The injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation.

This privilege "is rooted in common law and was created to foster 'the sacredness of the home and the peace of families.'" *State v. Price*, 46 S.W.3d 785, 799 (Tenn. Crim. App. 2000) (quoting *McCormick v. State*, 186 S.W. 95, 97 (1916)).

A trial court must find all four factors applicable before permitting a spouse to invoke the marital communication privilege. In *State v. Mitchell*, 137 S.W.3d 630, 638 (Tenn. Crim. App. 2003), this Court considered "whether the time of analysis for the presence or absence of the four factors is when the communication occurs or at the time of the trial court's inquiry into the application of the privilege," concluding that "factor (A) focuses on the expectation of the communicating spouse at the time of the communication, whereas assessment for the presence of factors (B), (C) and (D) must be done from the facts as they exist at the time of the trial court's ruling." *Id*.

As explained by Neil P. Cohen et al., TENNESSEE LAW OF EVIDENCE, § 5.01[4][d] (5th ed. 2005), the proponent of the privilege bears the burden of proof to show that it should be applied:

In most cases a privilege protects an individual, who alone possesses the facts needed to support the existence of the privilege. Accordingly, it is generally held that the party asserting a privilege has the burden of proving that the privilege is applicable.

This principle was applied in *Bryan v. State*, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992), where the court held that "the client has the burden of showing that the communications were made in the confidence of the attorney-client relationship."

- 12 -

In the present appeal, in asserting that the marital privilege should be applied and that Counsel was ineffective for failing to raise it, the Petitioner established only that he and the witness were married after the criminal event. Even assuming that Ms. Battle's statements were determined to be communication between the parties, no showing was made that the statement "originated in a confidence," that it would not be disclosed, or that it was not made within the earshot of others. Likewise, there is no proof to establish the existence of factors (B), (C), and (D). The record indicates that[1] Ms. Battle and the Petitioner were not speaking to one another by the time of trial and that the Petitioner was seeking a divorce. Thus, it is unclear how the Petitioner can assert that the statement should be kept confidential for "the full and satisfactory maintenance of the relation between the parties" and that his tenuous relationship with his wife "ought to be sedulously fostered."

Accordingly, we conclude that the record supports the post-conviction court's determination that the Petitioner failed to establish that the marital privilege applied to the statement. The record also supports the post-conviction court's finding that Counsel was not ineffective for failing to further challenge the testimony on this basis after his objection was overruled. Likewise, we conclude that the Petitioner has failed to show that Appellate Counsel was ineffective for not pursuing this issue on direct appeal. The Petitioner is not entitled to relief as to this issue.

## B. Mr. Richardson's Testimony

The Petitioner asserts that Counsel was ineffective for failing to file a motion to suppress his statements to Mr. Richardson. He contends that Mr. Richardson was functioning as an agent of law enforcement when the Petitioner made the statements and, therefore, the statements were subject to suppression. The State responds that there was no evidence that Mr. Richardson was acting as an agent of the State; thus, Counsel was not ineffective for not seeking suppression of Mr. Richardson's testimony nor was Appellate Counsel ineffective for not raising this issue on appeal. We agree with the State.

The post-conviction court made the following findings as to this issue:

[Counsel] testified that he did not pursue the theory that Mr. Richardson was a state agent because he could not find any evidence to support the theory. Apart from testimony from Petitioner and [Counsel], Petitioner has

---

[1] The trial transcript is not part of the post-conviction record; however, we take judicial notice of the record in the appeal of the petitioner's conviction. *See State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

- 13 -

presented no proof in support of the idea that Mr. Richardson was involved with the police in any way. Mr. Richardson was not a witness in this hearing, and his interaction or lack thereof with the police was merely mentioned in the hearing. Furthermore, [Counsel] testified that he explored the state agent theory and did not find evidence to support pursuing the theory further. This was a reasonable strategic trial decision. Additionally, there is no evidence to support that the motion to suppress would have been granted if filed. Therefore, no prejudice could attach to the failure to file the motion since it would not have any effect on the ultimate outcome of the trial. For the foregoing reasons, the claim that [Counsel] was ineffective in failing to file a motion to suppress the conversations between Petitioner and Mr. Richardson is without merit.

The Fifth and Sixth Amendment rights to counsel not only apply to direct confrontations by known government officers but also to "'Indirect and surreptitious interrogations'" by covert government agents and informants. *United States v. Henry,* 447 U.S. 264, 273, (1980). In order for a Fifth or Sixth Amendment violation to occur, the right to counsel must have been invoked or attached at the time of the violation, the informant must have been acting as a government agent, and the informant must have deliberately elicited incriminating information from the defendant. *State v. Willis*, 496 S.W.3d 653 (Tenn. 2016).

There is no evidence in the record that Mr. Richardson was a government agent or that Mr. Richardson deliberately elicited the relevant information from the Petitioner. Counsel testified that he was unable to confirm this information, referencing it as "chatter," and thus he had no basis upon which to file a suppression motion. Without a legal basis for a motion to suppress, we cannot conclude that Counsel was ineffective for not filing such a motion. Likewise, we do not conclude that Appellate Counsel was ineffective for excluding this issue on appeal. The Petitioner is not entitled to relief.

### C. Mr. Anderson's Testimony

The Petitioner asserts that Counsel was ineffective for failing to challenge Mr. Anderson's testimony as an indicted co-conspirator. The Petitioner explains that had the trial court excluded Ms. Battle's and Mr. Richardson's testimony, Mr. Anderson's testimony would have been inadmissible for lack of corroboration. He also argues that Appellate Counsel should have raised this issue on appeal. The Petitioner, however, has failed to prove that Ms. Battle or Mr. Richardson's testimony would have been excluded at trial. Furthermore, Mr. Anderson's testimony is corroborated by the police investigation of the crime scene, Mr. Nunley's phone records, the autopsy report, and Mr.

Flener's testimony.  Therefore, the Petitioner has not shown that Counsel or Appellate Counsel were ineffective.  The Petitioner is not entitled to relief.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE